[No. B163966. Second Dist., Div. Four. Dec. 4, 2003.]

THE PEOPLE, Plaintiff and Appellant, v.
JARED DANIEL JOHNSTON, Defendant and Respondent.

**COUNSEL**

Steve Cooley, District Attorney, George M. Palmer, Head Deputy District Attorney, Patrick D. Moran, Juliet Schmidt and Brent Riggs, Deputy District Attorneys, for Plaintiff and Appellant.

Edward H. Schulman, under appointment by the Court of Appeal, for Defendant and Respondent.

**OPINION**

**EPSTEIN, J.**—Jared Daniel Johnston, the defendant in this case, was convicted of second degree murder. The homicide arose out of a confrontation between defendant and his ex- girlfriend, at her residence. He had gone there to speak to her, armed with a knife. He arrived early in the morning. Once there he pounded on the door, walls, and windows, demanding that the ex-girlfriend come out. Her mother emerged and asked defendant to leave. Enraged, he shouted threats and obscenities, threatened to kill the entire family, and refused to leave. He repeatedly challenged the ex-girlfriend's brothers to come out and fight. Eventually a brother came out, unarmed, and a physical fight ensued. During the fight Johnston pulled out a knife and repeatedly stabbed the brother, inflicting a mortal wound.

He was charged with murder. The jury was instructed on first degree murder and almost the entire range of lesser included crimes, including

second degree murder and voluntary manslaughter, as well as self-defense. It convicted defendant of second degree murder, rejecting theories supporting a lesser crime. On his motion for new trial, the court found no malice in defendant's conduct, and reduced the crime to voluntary manslaughter based on sudden quarrel/heat of passion. It imposed sentence accordingly. The People have appealed that judgment.

Whether the trial court ruled correctly in reducing the crime to voluntary manslaughter is the major issue in this appeal. But it is encrypted in others, which we must first decide.

The first is whether the order reducing the crime is appealable by the People. That turns on whether any appellate disposition other than affirmance would violate double jeopardy principles. We conclude the disposition is appealable and that reversal with reinstatement of the jury's verdict would not violate jeopardy principles. We next consider the nature of discretion a trial judge may exercise on a motion for new trial in a criminal case, and how it was exercised in this case. On that point, we conclude that in appropriate cases trial judges may reduce a conviction to a lesser included offense and may do so based on insufficiency of evidence to support the greater crime. The insufficiency may be based on the trial court's assessment of the evidence, even though the evidence is sufficient to sustain the greater charge. It also may be based on a determination that the evidence is insufficient for the greater charge as a matter of law. We conclude that the order in this case was based on the latter assessment: the court ruled that, as a matter of law, defendant could not be guilty of murder since his conduct, however reprehensible, consisted only of words until he was physically attacked.

Whether this is a correct ruling is the final issue in the case. ■ We conclude that a defendant who provokes a physical encounter by rude challenges to another person to fight, coupled with threats of violence and death to that person and his entire family, is not entitled to claim that he was provoked into using deadly force when the challenged person responds without apparent (or actual) use of such force. We therefore shall reverse the judgment and direct that the jury's verdict finding defendant guilty of second degree murder be reinstated.[1]

## FACTUAL AND PROCEDURAL SUMMARY

■ Generally, we review the record in a criminal appeal by reading it most favorably to the prosecution, indulging every reasonable intendment in

---

[1] Defendant also argues the trial court erred in imposing one more year than was authorized for the crime and enhancement. In light of our disposition of the case, we do not decide that claim.

favor of the judgment. (See *People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738]; *People v. Staten* (2000) 24 Cal.4th 434 [101 Cal.Rptr.2d 213, 11 P.3d 968]; *Jackson v. Virginia* (1979) 443 U.S. 307 [61 L.Ed.2d 560, 99 S.Ct. 2781].) ■ Since this appeal is by the prosecution from a trial court order modifying the verdict as "contrary to law or evidence" (Pen. Code, § 1181, subd. 6; all further statutory references are to this code), we draw factual inferences that favor the trial court's determination. (See *People v. Andrade* (2000) 79 Cal.App.4th 651, 659 [94 Cal.Rptr.2d 314].)

Defendant and Tasha Gonzalves had a boyfriend-girlfriend relationship, but it ended a few days before the encounter that led to the charges in this case. Ms. Gonzalves moved into her parents' residence, which also was occupied by her two brothers, Jonathan (15 years old) and Anthony (in his 20's), and her father. On the day of the encounter, defendant appeared at the residence at 5:00 a.m. It was still dark. He began banging on the walls, windows, and doors. Ms. Gonzalves' father already had left for work, and her mother opened the door and asked defendant to leave. He refused, shouting obscene insults at Mrs. Gonzalves, and threatening to kill her entire family. He insisted on talking to his ex-girlfriend. He also called for Jonathan to come out. ("Come on, get the fuck out here. I'm going to fuck you up" and "Come outside and get a piece of me.") Defendant appeared to have been drinking. (No issue is raised on appeal concerning reduced ability to form any requisite intent on account of the consumption of alcohol.)

From inside the house, Jonathan told defendant to leave. He did not. Mrs. Gonzalves turned a water hose on defendant for about five seconds, with no effect. At some point, Anthony, who had been sleeping, awoke and yelled for defendant to leave. Ms. Gonzalves finally came out of the house and pushed defendant off the porch, repeatedly asking him to leave. He got back onto the porch, pounded the door, and persisted in remaining at the residence. He yelled to Anthony to come out, "bring it on," "get the fuck out here," and "I'm going to fuck you up. . . I'm going to kill you." Anthony banged his head on the kitchen screen door and finally came out, charging defendant. There was evidence that defendant struck the first blow, but according to other evidence (which we infer the trial court credited) the two immediately joined in a fight. Jonathan and Mrs. Gonzalves tried to intercede, without effect. Jonathan called 911 for help.

Anthony was 5 feet 11 inches tall, and weighed between 185 and 205 pounds. There was evidence that he worked out with weights, and could bench press 330 pounds. Defendant was 6 feet 1 inch tall, and weighed about 235 pounds.

At some point during the struggle, defendant pulled out the knife he had been carrying and stabbed Anthony. There were three stab wounds in Anthony's chest. One went through a bone. Another entered the chest and went down to the abdomen, near the navel. The third, which was fatal, protruded through the thickest muscle of the heart. Anthony also had stab wounds through the right and left side of his scrotum, probably caused by a single stab. The coroner said he had not seen a wound like it. Defendant had only superficial scratches, and did not require hospital treatment.

Ms. Gonzalves and Jonathan finally succeeded in restraining defendant, who threatened to kill Jonathan. Police arrived and defendant was arrested.

Defendant was charged with murder. The jury was instructed on first and second degree murder, and the lesser included crime of voluntary manslaughter based on sudden quarrel/heat of passion. (CALJIC Nos. 8.42–8.44.) It was specially instructed that "Provocation can only reduce murder to manslaughter when the victim actually initiated the provocation." The jury also was instructed on justifiable homicide based on self-defense, and "imperfect" self-defense as a basis for reducing the crime to voluntary manslaughter. (CALJIC Nos. 5.12–5.17.) It returned a verdict finding defendant guilty of second degree murder, with use of a deadly weapon.

Defendant moved for a new trial or reduction of the conviction to a lesser offense. Following a lengthy hearing, the court applied section 1181, subdivision 6, to reduce the crime from second degree murder to voluntary manslaughter, and sentenced defendant to the upper term for that crime. The People filed a timely notice of appeal.

## DISCUSSION

### I

The prosecution is entitled to appeal from an "order modifying the verdict or finding or reducing the degree of the offense or the punishment imposed or modifying the offense to a lesser crime." (§ 1238, subd. (a)(6).) That is precisely what happened in this case when the trial court, in its new trial order, reduced the crime from second degree murder to voluntary manslaughter. Defendant does not argue otherwise.

What defendant does argue is that entertaining a People's appeal in this situation violates jeopardy principles and, for that reason, doing so is beyond the jurisdiction of this court. His thesis is that the decision of the trial court that, as a matter of law, the evidence does not support second degree murder,

has the effect of an acquittal of charges for that crime, precluding an appeal that could lead to reinstatement of the conviction.

■ It is a general rule that a not guilty determination precludes appellate review, however flawed the determination may be. (U.S. Const., 5th and 14th Amends.; Cal. Const., art. I, § 15; see *United States v. Martin Linen Supply Co.* (1977) 430 U.S. 564 [51 L.Ed.2d 642, 97 S.Ct. 1349].) ■ Thus, in *People v. Hatch* (2000) 22 Cal.4th 260 [92 Cal.Rptr.2d 80, 991 P.2d 165], our Supreme Court recently held that dismissal of a criminal charge under section 1385 based on a trial court finding that the evidence did not support the charge, will be construed to have been made under the trial court's discretionary power to reweigh the evidence, unless the court explicitly stated that its decision was made on the basis that a jury could not convict on the evidence presented. The latter is the functional equivalent of an acquittal; the former is not. (*Hatch,* at p. 272.)

In *Hatch,* the court did not reach the question whether the section 1385 order is appealable. It was not required to do so, since the trial court did not indicate that it was ruling on the sufficiency of evidence as a matter of law. That issue was decided in *People v. Salgado* (2001) 88 Cal.App.4th 5 [105 Cal.Rptr.2d 373]: the order is appealable, and there is no jeopardy violation in entertaining the appeal and reversing the order of dismissal, if doing so does not result in a new trial.

■ If the trial court ruling occurs before a verdict, the jeopardy principle that a defendant ordinarily cannot be subjected to a second trial is invoked. But if the order is made post verdict, these policies are not compromised, because a successful prosecution appeal will not result in a new trial. In that situation, the case "can be resolved by entering judgment on the verdict. Far from placing [defendant] in jeopardy a second time, a reversal of the dismissal simply restores [defendant] to the position in which he found himself after the jury verdict in his only trial." (*People v. Salgado, supra*, 88 Cal.App.4th at pp. 12 and 13, citing other cases reaching the same conclusion; see also *People v. Craney* (2002) 96 Cal.App.4th 431 [117 Cal.Rptr.2d 147] [following *Salgado*].)

While these cases arose in the context of a section 1385 dismissal, there is no basis to distinguish between that and a reduction of a crime to a lesser offense based on the court's authority in section 1181, subdivision 6. Both involve postverdict determinations and neither involves a new trial. Indeed, in *Salgado* the trial court purported to dismiss charges after a trial on the basis of the new trial statute. Its doing so was improper since there had been no motion for new trial, and a trial court cannot grant a new trial without one. Nevertheless, the appellate court held that since all the requirements of

section 1385 were satisfied, it would not place form over substance and, instead, decided the issue on the merits of the jeopardy issue. (*People v. Salgado, supra*, 88 Cal.App.4th at p. 9.)

█ Accordingly, we conclude that the trial court's order is appealable by the prosecution and that our entertaining the appeal and reinstating the jury's verdict does not violate the double jeopardy rule.

## II

### A

As we have seen, the trial court acted under the Penal Code new trial provision, section 1181. That statute provides, in pertinent part:

"When a verdict has been rendered or a finding made against the defendant, the court may, upon his application, grant a new trial, in the following cases only: [¶] . . . [¶] 6. When the verdict or finding is contrary to law or evidence, but if the evidence shows the defendant to be not guilty of the degree of the crime of which he was convicted, but guilty . . . of a lesser crime included therein, the court may modify the verdict . . . accordingly without granting or ordering a new trial, and this power shall extend to any court to which the cause may be appealed."

█ This provision authorizes the trial court to exercise its independent judgment as to the sufficiency of the evidence to support the jury's verdict or finding, even to the extent of resolving conflicts in the evidence in a manner different from the jury's implicit findings. It authorizes the trial court to reweigh the evidence. (*People v. Robarge* (1953) 41 Cal.2d 628 [262 P.2d 14], the leading case.) The authority to modify a verdict to a lesser crime was added in 1927, modified in 1951, and remains the law.

When it reweighs the evidence, the trial court exercises broad discretion. (*People v. Robarge, supra*, 41 Cal.2d at p. 633; *People v. Lewis* (2001) 26 Cal.4th 334, 364 [110 Cal.Rptr.2d 272, 28 P.3d 34].) An appellate court does not have the same authority; in reviewing a trial court's discretion it is limited to deciding whether there has been an abuse. (*People v. Serrato* (1973) 9 Cal.3d 753, 761 [109 Cal.Rptr. 65, 512 P.2d 289], disapproved in *People v. Fosselman* (1983) 33 Cal.3d 572, 583, fn. 1 [189 Cal.Rptr. 855, 659 P.2d 1144], only to the extent the case implied that a trial court cannot grant new trial because of ineffective representation of counsel.) But when the trial court rules as a matter of law, appellate review is not so deferential; it is de novo. (*Ibid.*) Thus, a decision under section 1181, subdivision 6, may be overturned on appeal when it is based on an error of law, as distinguished

from a reweighing of conflicting evidence. (See *People v. Robarge, supra,* 41 Cal.2d at p. 633 [trial court order denying new trial reversed because that court erroneously considered itself bound to defer to jury fact determination].)

Whether the trial court in this case exercised its discretion in reweighing the evidence, or ruled as a matter of law, or did both, requires a discussion of its statements at the new trial hearing and in its subsequent memorandum.

At the hearing, the court said that the motion to reduce the crime to voluntary manslaughter was "an appropriate motion to make and grant, because the uncontroverted facts are that the defendant was obnoxious to a fault that morning, but that he committed no aggressive acts towards any members of the family. His ex-girlfriend came out, the mother came out, squirted him with the hose, the entire time he remained outside of the home. The law is clear that words in and of themselves are no justification for a self-defense."

"Taking all of the conduct of the defendant into question that night, it is clear that the young man who ended up being slain in this case came charging out of the house and, for lack of a better way to phrase it, slammed into him. It's also uncontroverted this young man was 220 to 230 pounds and a weight lifter. Looking at all of that, and taking into consideration the definition of sudden quarrel or heat of passion, the court does not believe that this is a second-degree murder, and that a more appropriate verdict is voluntary manslaughter, sudden quarrel or heat of passion and provocation explained, 8.42." (The last reference is to the CALJIC instruction on this form of voluntary manslaughter.)

Responding to the prosecutor's statement that in order to reduce the level of the crime the court would have to decide that the jury could not have found the crime to be second degree murder, the court responded, "Then that's what I'm saying." The prosecutor argued that the evidence supported the greater crime, to which the court responded "He stayed outside the whole time, he didn't bother anybody. There is no evidence—under your theory, then, I'm outside and I'm being obnoxious, and somebody comes out and attacks me and its automatically second degree murder." The prosecutor disagreed with that line of explanation, and argued that "[t]he standard isn't whether or not there was evidence that a jury could have found a manslaughter. For you to reduce it to a manslaughter the standard is they could not have found a second." The trial court disagreed, and the prosecutor responded that his version is "what the law is."

Of course, it is not. The prosecutor's argument is directly contradicted by *Robarge, People v. Borchers* (1958) 50 Cal.2d 321, 328 [325 P.2d 97], and

succeeding decisions. But the colloquy continued along this line, with the prosecutor arguing that the trial court could not reduce the level of the crime unless the evidence did not support the jury's finding that the greater offense had been committed, and that the evidence did support that verdict. The court said "And I'm agreeing with that." It finally said, "[t]hen I find there was totally insufficient evidence to justify a verdict of second-degree murder, counsel. That's what I'm trying to say. . . . I've read that section [of the Penal Code], and that's why if you apply this section it's a voluntary manslaughter today, tomorrow and forever. And there's nothing in here in this verdict to show a second. . . . [The jury] never should have found this young man guilty of a second." After a final exchange to the same effect, the court indicated that it would say no more on the subject.

Later in the day of the new trial hearing, the trial court issued a statement of decision. It did so out of a stated concern that the record was unclear as to the basis for its ruling and the standard of review that it used. This time the trial court disagreed with the prosecutor's argument that it could not reweigh the evidence; it concluded that it had a responsibility to do so, and had done so. It then summarized salient facts from the evidence. The court recounted that up to the point where Mrs. Gonzalves turned the water hose on defendant, there had been no acts of violence by defendant; that defendant was "rude, obnoxious, foul mouthed and otherwise antisocial but he had not physically even threatened anyone," no knife had been seen; the victim returned to the house and the defendant told him to come out and, "roaring and yelling at the defendant" he "rushed out of the house and charged the defendant." The victim was in his early 20's, weighed 210–220 pounds, was a weight lifter and very strong. There was an instantaneous struggle, which the victim was winning, when the victim's brother joined in the fight and it was then that the death blow was dealt.

The court proceeded to its analysis: "It must be remembered that words no matter how provocative do not justify the use of force. The defendant was challenging from outside of the house. The victim came bursting out of the house. The evidence is clear that in terms of the first actual violence, the victim charged the defendant. A fist fight occurred. During the fist fight a second person joined against the defendant. Still no knife is seen. The court in weighing the evidence and looking at the total circumstances before, during and after the killing finds that there is insufficient evidence to show malice aforethought present before or at the time of the killing. In examining all of the facts and reweighing the evidence the court finds that malice aforethought is not supported by the evidence. This is a necessary element of second degree murder and therefore the court finds that in reviewing the evidence that it does not support the verdict."

(In these recitations, the trial court erred in several of the details of the encounter. For example, there was no evidence that Anthony "returned to the house" after having been outside, or that another person joined in the affray, attacking defendant. There was evidence that after the struggling pair fell over a fence into the driveway area, Jonathan and Mrs. Gonzalves grabbed defendant and saw that he had a knife. These details are not dispositive to the merits of the appeal.)

If these remarks mean that the court concluded that, in its independent judgment, the weight of the evidence did not support second degree murder, the trial court's conclusion must be upheld unless it was an abuse of discretion. If they mean that a reasonable jury could not find a verdict of second degree murder under the evidence presented, our review is de novo. Defendant argues the ruling was made as a matter of law, and the prosecution does not quarrel with that assessment.

We agree that, fairly read, the trial court's essential ruling was that, as a matter of law, the evidence did not support second degree murder. The court said so, and explained its reason: it was the victim, not defendant, who started the fight; words alone are not sufficient provocation for a physical altercation; and all defendant did was utter words, albeit obnoxiously. The trial court's remarks can be reconciled. To the extent it was deciding the facts concerning the confrontation, we must defer to its assessment, even though the jury inferably reached different conclusions, so long as there is evidence to support the court's assessment. Thus, we assume that the victim "stormed" out of the house and charged defendant in response to defendant's statements, and that defendant was getting the worst of the fight before he resorted to deadly force.

The question, then, is whether the facts viewed in this light justified a reduction of the offense. As we explain in the final part of our discussion, we conclude they do not. We also explain that, even if the court's ruling was entirely based on a reweighing of the evidence, it cannot stand because there remains a deliberate killing without justification or legal mitigation. The law implies malice in that situation, and classifies the crime as second degree murder.

### B

We are left with the following. Defendant, angered with his ex-girlfriend and her family, armed himself with a knife and traveled to her family's residence, where she was then living. He demanded that she come out of the house. He was verbally abusive to her mother and to members of her family. He refused to leave the home although repeatedly asked to leave by every

member of the family who was present. He threatened violence against the mother—indeed, he threatened to kill the entire family. He stood on the porch of the home, shouting and challenging his ex-girlfriend's brothers to come out and fight, using particularly abusive language. The older brother did come out and a mutual fight ensued. The brother was unarmed, but was getting the better of defendant in the fight. Defendant pulled out his knife and inflicted a series of wounds, one of which was fatal. Defendant was not seriously injured in the fight. It is not disputed that, as the jury found, defendant intended to kill the victim. The jury was instructed on self-defense, and rejected that theory. It also rejected "imperfect self-defense" (that defendant unreasonably but actually was convinced of the need to use deadly force to defend himself; *People v. Flannel* (1979) 25 Cal.3d 668, 674 [160 Cal.Rptr. 84, 603 P.2d 1]). The trial court concluded that, however offensive defendant's conduct, there was no malice in his act, and so reduced the crime from second degree murder (a crime that requires malice as an element, except in its felony-murder aspect) to voluntary manslaughter based on sudden quarrel/heat of passion. The question is whether it was justified in doing so.

■ The essence of the sudden quarrel/heat of passion voluntary manslaughter is that the killer is so provoked by acts of the victim that he strikes out in the heat of passion, an emotion that obliterates reason that would prevail in the mind of a reasonable person. That circumstance negates malice aforethought, and reduces the crime from second degree murder, which otherwise would be its classification. (See *People v. Lasko* (2000) 23 Cal.4th 101, 108 [96 Cal.Rptr.2d 441, 999 P.2d 666] and cases cited; *People v. Valentine* (1946) 28 Cal.2d 121, 138 [169 P.2d 1], in which the history and development of the sudden quarrel/heat of passion mitigation is discussed; and *People v. Spurlin* (1984) 156 Cal.App.3d 119, 124 [202 Cal.Rptr. 663], in which it is applied.)

Our Supreme Court has summarized the applicable law, "The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation] or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.] 'Heat of passion arises when "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinary reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' [Citation.] [¶] . . . [¶] The test of adequate provocation is an objective one, however. The provocation must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment.

Adequate provocation and heat of passion must be affirmatively demonstrated." (*People v. Lee* (1999) 20 Cal.4th 47, 59, 60 [82 Cal.Rptr.2d 625, 971 P.2d 1001].)

Can a person who provokes a fight be heard to assert provocation by the victim, such that a reasonable person in his position would lose judgment and kill? There is not a great deal of authority on the subject, but what there is gives a negative answer.

Thus, in *People v. Hoover* (1930) 107 Cal.App. 635 [290 P. 493], the defendant struck a person after a verbal argument had erupted. A bystander said to defendant that the physical attack was uncalled for, and defendant replied, " 'You want some of it too.' " (*Id.* at p. 637.) He then struck the bystander and, as the fight continued, stabbed him to death. The court rejected his argument that the evidence supported voluntary manslaughter at most: "It may not be reasonably contended, however, that one who has instigated a quarrel, who is himself the aggressor and who in good faith has failed to desist and withdraw from the fistic encounter, may resort to the use of a deadly weapon and then escape from the penalty of murder on the theory that it was the fault of a sudden quarrel or that the fatal act was the result of mere heat of passion." (*Id.* at pp. 637, 639; see also *People v. Montezuma* (1931) 117 Cal.App.125, 130 [3 P.2d 370] (follows *Hoover*).)

A leading commentator has treated the issue in the following terms: "If the defendant causes the victim to commit an act which the defendant could claim provoked him, he cannot kill the victim and claim that he was provoked. In such case, he is deemed to have acted with malice and would be guilty of murder. Thus, a defendant is guilty of murder when he arms himself and plans to insult the victim and then kill him if the victim strikes him in resentment over the insult." (2 Wharton's Criminal Law (15th ed. 1994) § 157, p. 352.)

The Model Penal Code would substantially liberalize what we speak of as voluntary manslaughter by including within that classification a homicide "committed under the influence of extreme mental or emotional disturbance for which there is reasonable explanation or excuse." (Model Pen. Code, § 210.3, subd. (1)(b).) The official commentary cites a similar recommendation by the National Commission on Reform of Federal Criminal Laws. That formulation would recognize such emotional disturbance on the part of the offender as a basis for reducing the homicide from murder "if it is occasioned by any provocation, event or situation *for which the offender was not culpably responsible.*" (Model Pen. Code & Commentaries, com. to § 210.3, p. 64, fn. 60.) This caveat, according to the comment, is "implicit in the Model Code formulation." (Model Pen. Code & Commentaries, com. to § 210.3, pp. 64–65.)

That is our case. We may assume that defendant did not travel to his ex-girlfriend's residence for the purpose of committing a homicide, even though he armed himself with a knife before going there. But it was he who instigated the fight with Anthony by creating a loud disturbance at the residence, cursing the mother of the victim and girlfriend and, most particularly, challenging Anthony to come out and fight. Having done that, he cannot be heard to assert that *he* was provoked when Anthony took him up on the challenge. Defendant was "culpably responsible" for the altercation.

The trial court focused on the fact that defendant, while shouting, was only uttering words and did not strike the first blow, and cites the self-defense principle that words alone are insufficient to justify use of deadly force. That might be an issue if Anthony were on trial for attacking defendant. But to apply it to defendant, exonerating him of the greater offense of second degree murder, is to stand the doctrine on its head.

One may suppose a situation in which defendant was unarmed and challenged Anthony to a fight, then used deadly force when Anthony suddenly produced a lethal weapon. But in that case the defense would not be mitigation to voluntary manslaughter but justification, full or partial, by self-defense.

It is noteworthy that the trial court confused voluntary manslaughter with self-defense when it said that words by themselves do not justify self-defense. (In fact, the jury was instructed that words alone, however objectionable or insulting, if unaccompanied by a threat or assault do not justify assault with a deadly weapon, nor do they constitute a defense to a charge of having committed such an assault.) (CALJIC No. 9.11.) While the court confabulated the doctrines, there is a core comparison. Defendant's words did not justify Anthony's attack. Absent some form of self-defense, which is negated in this case, neither does Anthony's physical attack in response to defendant's challenge to fight justify or mitigate defendant's use of deadly force.

As we have discussed, defendant proceeds on the alternative theory that the trial court decided, in reweighing the evidence, that Anthony's attack negated malice on defendant's part, reducing the crime to voluntary manslaughter. If that was the trial court's meaning, its ruling would still be an abuse of discretion, for it would have set aside a crime defendant did commit in order to punish him for one he did not commit. "An unlawful killing with malice is murder. (§ 187.) Nonetheless, an intentional killing is reduced to voluntary manslaughter if other evidence negates malice. Malice is presumptively absent when the defendant acts upon a sudden quarrel or heat of passion on sufficient provocation (§ 192, subd. (a)), or kills in the unreasonable, but good faith, belief that deadly force is necessary in self-defense. [Citation.] *Only*

*these circumstances negate malice when a defendant intends to kill."* (*People v. Lee, supra,* 20 Cal.4th 47, 59, italics added; and see *People v. Serrato, supra,* 9 Cal.3d at p. 762 [court cannot reduce offense to crime neither charged nor proved].)

It is undisputed that defendant intended to kill Anthony when he stabbed him in the heart. The jury rejected both forms of self-defense, and no argument is presented on appeal on that account. For the reasons we have summarized, defendant cannot claim provocation such as to reduce the crime to voluntary manslaughter. In these circumstances the law classifies his crime as second degree murder.

## DISPOSITION

The judgment is reversed and the case is remanded to the trial court with instructions to reinstate the verdict rendered by the jury and to impose sentence accordingly.

Vogel (C. S.), P. J. and Curry, J. concurred.

A petition for a rehearing was denied December 19, 2003, and respondent's petition for review by the Supreme Court was denied March 3, 2004.